[This opinion has been published in *Ohio Official Reports* at 79 Ohio St.3d 421.]

THE STATE OF OHIO, APPELLEE, *v.* DENNIS, APPELLANT.

[Cite as *State v. Dennis*, 1997-Ohio-372.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 96-1376—Submitted July 7, 1997—Decided September 24, 1997.)

APPEAL from the Court of Appeals for Summit County, No. 17156.

————————————

{¶ 1} During the early morning hours of June 5, 1994, defendant-appellant, Adremy L. Dennis, and Leroy "Lavar" Anderson stopped Dean R. Pizer in the Highland Square area of Akron and demanded money. Pizer escaped, even though a shotgun blast was fired at him as he fled. Shortly thereafter, Dennis shot and killed Kurt O. Kyle during a robbery in front of Kyle's home at 818 Bloomfield Road. Dennis later admitted he shot Kyle during a robbery, and he was subsequently convicted of aggravated murder, attempted aggravated murder and aggravated robbery, and sentenced to death.

{¶ 2} Late on Saturday, June 4, and in the early morning hours of Sunday, June 5, Dennis and Anderson decided to go to a bar and "meet some chicks." Anderson spoke of "robbing somebody," and the pair armed themselves with weapons: Dennis with a sawed-off shotgun and Anderson with a .25 caliber handgun. As the pair proceeded to the bar, the shotgun, according to Dennis, accidentally went off. Dennis then reloaded the weapon. Before arriving at the bar, the two smoked marijuana.

{¶ 3} After some drinks, Anderson and Dennis left the bar and encountered Dean Pizer in an alley near West Market Street and South Highland Avenue. The "taller one" of the two, whom Pizer identified as Dennis, was wearing a long black leather coat and told Pizer, "Give me your money. * * * Don't try and run, don't try and run. You are going to die tonight, you are going to die." Pizer testified that

he went backwards, slid and rolled down a hill, then ran away unharmed. He heard a gunshot "just left of me. There was a trash can or something got hit * * *."

{¶ 4} That same night, Kurt Kyle had raced at Barberton Speedway and afterwards hosted several friends and family members at his home for a cookout and socializing. Later, as one of his guests, Martin Eberhart, was leaving, Kyle walked with him to his car where the two continued conversing for a short time. While Eberhart was seated in his car talking with Kyle, they heard a loud noise, which Kyle told Eberhart was a gunshot. About three minutes later, two black males approached them in the driveway, out of the view of Kyle's other guests. The man Eberhart identified as Anderson was wearing a green and orange Miami Hurricanes Starter jacket, and demanded money while pointing a gun at Eberhart's neck. Eberhart slowly reached under the car seat for his wallet and handed Anderson $15.

{¶ 5} At the same time, Dennis, whom Eberhart described as wearing a long, three-quarter-length dark coat, asked Kyle for money. However, Kyle searched through his pockets and told Dennis that he had no money with him. Dennis then pulled out a sawed-off shotgun and shot Kyle in the head at point-blank range. Kyle died instantly of hypovolemic shock (loss of blood) due to a gunshot wound that severed both carotid arteries. According to Eberhart, the two assailants ran away together "sprinting very fast."

{¶ 6} Anita Foraker, who lived in the neighborhood, was out walking her dog at around 1:30 a.m. that morning and heard a "loud pop type of sound." About a minute later, she observed two young black males headed in the opposite direction running by her on the other side of Bloomfield Road. She heard one say to the other, "Did you get it?"

{¶ 7} A few days after the murder, Akron police received an anonymous phone call stating that someone at 371 Grand Avenue knew about the homicide that past weekend. Detective Donald L. Gaines and another detective went to the

2

address, where they met Shirley Morgan and told her that a possible suspect was staying at her house. Morgan invited the detectives in and gave them permission to look around the house and to speak to her son, seventeen-year-old Lavar Anderson. When the detectives went down to the basement, they noticed a Miami Hurricanes jacket and a long, dark overcoat hanging up in the far corner on a bedrail. At that time, they took Anderson into custody, and he provided detectives information about the location of the murder weapon.

{¶ 8} After procuring a search warrant, police seized several items from Morgan's basement, including the two coats, a .25 caliber pearl handle handgun, a 20 gauge sawed-off shotgun, and seven shotgun shells.

{¶ 9} Upon completing the search of Morgan's home, Gaines received a call from two officers at 120 Burton Avenue, which was in the same general neighborhood. The police surrounded the house on Burton and thereafter apprehended Adremy Dennis.

{¶ 10} At the police station, Dennis was advised of his *Miranda* rights, which he waived. Dennis told several versions as to his whereabouts on June 4-5, 1994 to Detectives Gaines, Lacy, and Offret. After Dennis's second statement, Gaines produced a sawed-off shotgun, which Dennis immediately claimed was his own. In his fourth statement to detectives, Dennis admitted that he and Anderson had planned some robberies that night and admitted holding up Pizer, Eberhart and Kyle. However, while Dennis admitted aiming the sawed-off shotgun at Kyle, he also claimed the gun went off accidentally. Dennis agreed to allow detectives to tape his statement.

{¶ 11} In his taped statement, Dennis said that he and Anderson had smoked marijuana and then drank at a bar before the robberies and murder. While Dennis admitted he fired the sawed-off shotgun three times that night, he asserted that each shot was accidental and that he "could barely focus" when they came upon Kyle

and Eberhart. After shooting Kyle, Dennis claimed he almost fell down and that Anderson had to help him flee the scene.

{¶ 12} Yellow shotgun shell casings were found a few days after the murder. One was found in the area where Pizer was accosted, the other was discovered in front of Kyle's home. Nancy E. Bulger, a forensic scientist with the Bureau of Criminal Identification and Investigation ("BCI"), determined that the two casings were fired from the sawed-off shotgun that Dennis identified as his own.

{¶ 13} The grand jury indicted Dennis on one count of aggravated murder, one count of attempted murder, three counts of aggravated robbery, and one count of possession of dangerous ordnance. All of the counts carried a firearms specification, and the dangerous ordnance charge also carried a physical-harm specification. The aggravated murder count also carried two death specifications: murder during an aggravated robbery, where Dennis was the principal offender (R.C. 2929.04[A][7]); and murder committed as a course of conduct involving the killing or attempt to kill two or more persons (R.C. 2929.04[A][5]).

{¶ 14} A jury trial commenced December 12, 1994. After deliberation, the jury found Dennis guilty as charged.

{¶ 15} During the mitigation hearing, several witnesses testified on Dennis's behalf, including an aunt on his mother's side, his foster mother, and a psychologist, Dr. James L. Brown. Dr. Brown concluded that he found at least three factors militating against imposing the death penalty on Dennis: (1) Dennis's development — he lacked effective "parenting" until he was about fifteen years old; (2) Dennis's intoxication at the time of the offense, due to consuming alcohol and smoking marijuana dipped in embalming fluid, which further impaired his judgment; and (3) Dennis's youth.

{¶ 16} Dennis gave unsworn testimony and claimed that he didn't intend to shoot Kyle, and that he "was drunk and nervous and scared and the gun went off

4

and I ran." Dennis expressed remorse for what he had done and stated that he was sorry for what he had done to the Kyle family.

{¶ 17} The parties stipulated that Dennis has no adult criminal record and only two juvenile adjudications: criminal damaging and receiving stolen property.

{¶ 18} The jury recommended the death penalty, and the trial court imposed a death sentence on Dennis. The court also imposed consecutive and concurrent sentences for Dennis's other offenses. Upon appeal, the court of appeals affirmed the convictions and sentence of death.

{¶ 19} The cause is now before this court upon an appeal as of right.

_____

*Maureen O'Connor,* Summit County Prosecuting Attorney, *Philip D. Bogdanoff* and *Paul M. Maric,* Assistant Prosecuting Attorneys, for appellee.

*Peter T. Cahoon* and *Nathan A. Ray,* for appellant.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 20} In this appeal, Dennis has raised twenty-one propositions of law. Finding none meritorious, we affirm his convictions. In addition, we have independently reviewed the record, weighed the aggravating circumstances against the mitigating factors, and examined the proportionality of the death sentence in this case to the penalty imposed in similar cases. Upon a complete review of the record, we affirm Dennis's convictions and sentences.

I

*Pretrial/Voir Dire Issues*

{¶ 21} In Proposition of Law No. 1, Dennis contends the trial court erred in failing to suppress his oral statements to police. Dennis further submits that the state failed to show that he was sober when he waived his *Miranda* rights, and therefore under the totality of circumstances, the prosecution failed to demonstrate that he understood his *Miranda* rights.

**{¶ 22}** During the suppression hearing, Akron Police Lieutenant Robert Offret testified that he and two other detectives interviewed Dennis after he had been given *Miranda* warnings. In the taped interview, Dennis stated that he had not been under a doctor's care or on any medications, and had not consumed any alcohol. However, Dennis admitted to smoking "two joints" of marijuana two hours earlier. Nevertheless, Offret stated there wasn't anything about Dennis's behavior that would have led him to believe that Dennis was intoxicated. Moreover, Dennis's responses in the taped interview do not exhibit any of the usual symptoms of intoxication, such as slurred speech, inattentiveness, and inability to understand questions.

**{¶ 23}** Whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct issues. Both, however, are measured by the totality-of-circumstances standard. *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854.

**{¶ 24}** A review of the tape and transcript indicates that after police read Dennis each *Miranda* right, they asked him if he understood it, and he responded affirmatively. In addition, Dennis initialed each line on the *Miranda* warning form, acknowledging that he understood his rights, and he signed the waiver of rights. Evidence of a written waiver form signed by the accused is strong proof that the waiver was valid. *Clark;* see *North Carolina v. Butler* (1979), 441 U.S. 369, 374-375, 99 S.Ct. 1755, 1758-1759, 60 L.Ed.2d 286, 293. Moreover, there is no evidence that police subjected Dennis to threats or physical abuse, or deprived him of food, sleep, or medical treatment. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 28, 544 N.E.2d 895, 908.

**{¶ 25}** Under the totality of circumstances, Dennis made a knowing, voluntary, and intelligent waiver of his constitutional rights. Accordingly, we reject Proposition of Law No. 1.

{¶ 26} In Proposition of Law No. 2, Dennis argues that the trial court erred in failing to suppress items seized pursuant to a search warrant at the residence of Shirley Morgan. Dennis asserts that he has standing to object to a search of Morgan's home, and that he had an expectation of privacy in the area where the items were seized, since he allegedly had permission to spend part of the night there on the night of the murder.

{¶ 27} A few days after the Kyle murder, police received an anonymous phone call supplying information regarding the whereabouts of a possible suspect in the murder. After obtaining this information, police received permission from Morgan to speak to her son, Lavar Anderson, and to look around her house for coats that were reportedly worn by the suspects to the murder. After finding coats in the basement that matched the description of the coats they sought, the police asked permission to take them, but Morgan refused their request and said she needed to talk to her attorney. At that time, police took Anderson into custody, and Anderson later told them where he and Dennis hid the weapons in the basement after the murder. Based on this information and their personal observations, police obtained a search warrant for Morgan's home and later seized the coats and the weapons used in the robberies and murder.

{¶ 28} Fourth Amendment rights are personal in nature and may not be vicariously asserted by others. *Alderman v. United States* (1969), 394 U.S. 165, 174, 89 S.Ct. 961, 966-967, 22 L.Ed.2d 176, 187; *Rakas v. Illinois* (1978), 439 U.S. 128, 133-134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387, 394; *State v. Coleman* (1989), 45 Ohio St.3d 298, 306, 544 N.E.2d 622, 631. A defendant bears the burden of proving not only that the search was illegal, but also that he had a legitimate expectation of privacy in the area searched. See *Rawlings v. Kentucky* (1980), 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633, 641.

{¶ 29} Dennis has failed to show that he had a reasonable expectation of privacy in Morgan's residence. While an overnight guest has standing to challenge

the legality of a search, *Minnesota v. Olson* (1990), 495 U.S. 91, 96-97, 110 S.Ct. 1684, 1688, 109 L.Ed.2d 85, 93, there was no evidence that Dennis stayed overnight or that he was residing at Morgan's home at the time of the search. In fact, once Morgan discovered that Dennis was in her house the night of the murder, she made him go home.

{¶ 30} Dennis has failed to demonstrate that he had standing to object to the warrant or subsequent search. *Coleman*. Moreover, Morgan clearly had authority over the premises that she permitted police to enter and view. See *Illinois v. Rodriguez* (1990), 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148, 161. The police had Morgan's consent to search the premises, and the items seized were therefore the fruits of a valid search. Accordingly, Proposition of Law No. 2 is not well taken.

{¶ 31} In Proposition of Law No. 5, Dennis contends that the court erred in refusing to excuse juror Terri Harris once it discovered that she had been a victim of crime.

{¶ 32} During the jury's penalty-phase deliberations, the trial court learned that Harris had been a victim of sexual abuse as a child, when a detective asked the court to momentarily excuse Harris from deliberations in order to sign a criminal complaint. The court brought Harris into chambers before the parties and conducted a voir-dire examination of her at that time. Harris explained that she had decided not to mention the sexual abuse during the original voir-dire examination because she did not feel it fit the definition of violent crime. She reached this conclusion after asking the trial judge's bailiff during jury selection for a definition of "violent crime." Harris indicated that at that time, she concluded that her experience was not "violent" when compared to murder, and, therefore, did not bring it to the court's attention.

{¶ 33} The court questioned Harris extensively, and she was adamant that her status as a victim of sexual abuse had nothing to do with what happened to the

Kyle family or Dennis, and that she could separate the two experiences and be impartial. The court asked defense counsel if they had anything they wished to put on the record, and defense counsel indicated they did not. After Harris returned to the jury room, counsel for both sides informed the court that just prior to trial they became aware of the fact that Harris had been a witness to sexual abuse. Counsel for both parties agreed that it probably wasn't necessary for them to act upon it. However, at the end of the trial, defense counsel filed a motion for mistrial upon learning that Harris was a victim of sexual abuse, and not just a witness.

{¶ 34} A trial court enjoys broad discretion in determining a juror's ability to be impartial. *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 351, 452 N.E.2d 1323, 1331. The trial court's decision to allow Harris to remain on the jury did not amount to an abuse of discretion, especially in light of the court's voir-dire examination of Harris conducted in chambers during penalty-phase deliberations. See *State v. Maurer* (1984), 15 Ohio St.3d 239, 250-251, 15 OBR 379, 389, 473 N.E.2d 768, 781. Accordingly, Proposition of Law No. 5 is overruled.

{¶ 35} In Proposition of Law No. 7, Dennis asserts the trial court erred in permitting the prosecution's peremptory challenges of two prospective jurors who were African-Americans in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. Dennis submits that the prosecution failed to provide a neutral explanation for exercising peremptory challenges on prospective jurors McGinnis and Dortch.

{¶ 36} In order to state a prima facie case of purposeful discrimination under *Batson*, an accused must demonstrate (1) that members of a recognized racial group were peremptorily challenged, and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenges to exclude prospective jurors on account of their race. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 582, 589 N.E.2d 1310, 1313; *State v. Hill* (1995), 73 Ohio St.3d 433,

444-445, 653 N.E.2d 271, 282. If the accused makes a prima facie case of discrimination, the state must then come forward with a neutral explanation. *Id*. However, a trial court's finding of no discriminatory intent "will not be reversed on appeal absent a determination that it was clearly erroneous." *Hernandez* at 583, 589 N.E.2d at 1314.

{¶ 37} The trial court held that "with *Batson* in mind," the state's peremptory challenges of prospective jurors McGinnis and Dortch were proper. Moreover, the court's ruling was not "clearly erroneous" under *Hernandez*. The facts and circumstances underlying the prosecutor's exercise of peremptories on the two prospective jurors in issue do not appear to be racially motivated. Both prospective jurors expressed opposition to the death penalty on religious grounds. While, after defense questioning, both prospective jurors eventually opined that they thought they could impose a death sentence, the fact remains that both were still opposed to capital punishment on religious grounds.

{¶ 38} The prosecutor explained that he exercised peremptory challenges on McGinnis and Dortch based on their views of the death penalty. In addition, the prosecutor cited the fact that Dortch stated she had a cousin who had been murdered. Thus, the prosecutor gave a race-neutral explanation for the peremptory challenges. *Hill; Hernandez*. Accordingly, Proposition of Law No. 7 is without merit.

{¶ 39} In Proposition of Law No. 9, Dennis argues that the prosecutor's systematic use of peremptory challenges to exclude prospective jurors who expressed reservations about the death penalty deprived him of an impartial jury.

{¶ 40} Once again, Dennis claims error in the exclusion of prospective jurors McGinnis and Dortch from the panel. However, apart from excluding prospective jurors based on gender or race, as discussed above, prosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a

court's control. See, *e.g., State v. Seiber* (1990), 56 Ohio St.3d 4, 13, 564 N.E.2d 408, 419. Therefore, we overrule Proposition of Law No. 9.

{¶ 41} In Proposition of Law No. 8, Dennis contends he was denied a fair trial when prospective jurors Spencer and Williams were improperly excused for cause based on their views on the death penalty.

{¶ 42} In *State v. Frazier* (1995), 73 Ohio St.3d 323, 327, 652 N.E.2d 1000, 1006, we reaffirmed the standard in *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841,

" 'The proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.' "

{¶ 43} Prospective juror Spencer stated unequivocally during voir dire that she did not feel she could recommend the death sentence. She further stated that she would have a "lot of trouble" imposing death, even if the court instructed the jury that it was worthy of consideration. Spencer also indicated that she did not feel she could put her beliefs aside and follow the law. When asked if she could recommend the death penalty, Spencer replied, "I don't feel I could really do that."

{¶ 44} Prospective juror Williams also indicated that based on religious and moral grounds, she could not follow the law and recommend the death penalty. After further questioning, Williams insisted that "[i]t will be a big problem for me to sign and say that, yes, I believe in the death penalty or I believe this person should be given the death penalty."

{¶ 45} We have previously stated that where the trial court is left with a definite impression that a prospective juror would be unable to faithfully and impartially apply the law, deference must be given to the trial judge who sees and hears the prospective juror. *State v. Beuke* (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274, 284-285. The trial court did not abuse its discretion in excusing the two

prospective jurors for cause. Both expressed views that would prevent or substantially impair them from fulfilling their duties as jurors. *State v. Tyler* (1990), 50 Ohio St.3d 24, 30, 553 N.E.2d 576, 586. Accordingly, we overrule Proposition of Law No. 8.

{¶ 46} In Proposition of Law No. 3, Dennis argues the trial court erred in denying his motion to sever the counts with which he was charged. Dennis asserts that the charges against him regarding his encounter with Pizer are not sufficiently related in point of time and circumstance with the Kyle murder-robbery.

{¶ 47} Crim.R. 8(A) permits joinder of offenses that are a part of a common scheme or plan, or part of a course of criminal conduct. Crim.R. 14, however, requires a separate trial of counts if it appears that a defendant is prejudiced by a joinder of offenses for trial.

{¶ 48} In our view, Dennis's claim must be rejected because he fails to demonstrate how he was prejudiced by the joinder of counts. *State v. Roberts* (1980), 62 Ohio St.2d 170, 175, 16 O.O.3d 201, 204, 405 N.E.2d 247, 251; *State v. Benner* (1988), 40 Ohio St.3d 301, 305, 533 N.E.2d 701, 708. See, also, *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293, 298. Similar to the situation presented in *State v. Hamblin* (1988), 37 Ohio St.3d 153, 524 N.E.2d 476, the counts alleging the crimes committed against Pizer, Kyle, and Eberhart were sufficiently related in point of time and circumstance. The crimes were the fruit of Dennis and Anderson's plan to rob some people that night. Both incidents occurred within a few blocks and a few minutes of each other. See *State v. Woodard* (1993), 68 Ohio St.3d 70, 73, 623 N.E.2d 75, 78. Moreover, the robbery and attempted murder of Pizer strongly supports the inference that Dennis intended to kill Kyle, thus negating Dennis's assertion that the Kyle murder was accidental. Cf. Evid.R. 404(B). Thus, the Pizer robbery would have been admissible even if no joinder had been accomplished, in order to prove intent and the multiple-murder death penalty specification in the Kyle murder. In any event, the failure to sever the counts did

not amount to an abuse of discretion. See *Maurer,* 15 Ohio St.3d at 250, 15 OBR at 388-389, 473 N.E.2d at 780-781. Therefore, we reject Proposition of Law No. 3.

{¶ 49} In Proposition of Law No. 6, Dennis complains that he was denied due process when the trial court precluded defense counsel from questioning prospective jurors about specific mitigating factors. However, as Dennis concedes, we rejected this same argument in *State v. Wilson* (1996), 74 Ohio St.3d 381, 385-387, 659 N.E.2d 292, 300-301. Similar to *Wilson*, the trial court here allowed adequate, detailed questioning of prospective jurors to expose faults that would render a juror ineligible. No abuse of discretion is apparent, and, therefore, this proposition of law is overruled.

II

*Trial Issues*

{¶ 50} In Proposition of Law No. 11, Dennis contends that the trial court erred in denying his Crim.R. 29(A) motion for acquittal based on insufficiency of evidence. Dennis asserts that the charge of attempted aggravated murder of Pizer is not supported by the evidence, and that, therefore, the attendant course of conduct specification cannot be maintained.

{¶ 51} When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact. *Jenks,* 61 Ohio St.3d at 273, 574 N.E.2d at 503. See, also, *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.

**{¶ 52}** At trial, Pizer testified that Dennis and another individual accosted him with guns when he was in the Highland Square area on the night or early morning hours of June 4-5, 1994. Dennis did most of the talking, and asked Pizer for his money. Then, Dennis told him, "Don't try and run, don't try and run. You are going to die tonight, you are going to die." When Pizer fled the scene, he "heard a gunshot just left of me. There was a trash can or something got hit."

**{¶ 53}** In his recorded statement, Dennis admitted that he and Anderson held up a man near the bar in Highland Square. Dennis stated that when the victim took off running, "I got the gauge [shotgun] out and * * * shot it again."

**{¶ 54}** One witness testified that two days after the shooting, he found a yellow shotgun shell on the sidewalk near the bar in the Highland Square area. The shotgun shell was determined to have been fired from the murder weapon.

**{¶ 55}** Construing this evidence in a light most favorable to the state, a rational factfinder could have found the essential elements of the attempted aggravated murder charge and course-of-conduct specification proven beyond a reasonable doubt. Therefore, we overrule Proposition of Law No. 11.

**{¶ 56}** In Proposition of Law No. 17, Dennis asserts the trial court erred in admitting what he claims were gruesome, prejudicial, and cumulative photographs.

**{¶ 57}** Under Evid.R. 403 and 611(A), the admission of photographs and similar evidence is left to the sound discretion of the trial court. *Maurer,* 15 Ohio St.3d at 264, 15 OBR at 401, 473 N.E.2d at 791. Nonrepetitive photographs in capital cases, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused. *Maurer* at paragraph seven of the syllabus; see, also, *State v. Slagle* (1992), 65 Ohio St.3d 597, 601-602, 605 N.E.2d 916, 923.

**{¶ 58}** Dennis specifically objected to three of the five photos of the murder victim admitted at trial. Thus, any error in the admission of the other two photos is

waived due to the lack of an objection. See *Slagle, supra*, 65 Ohio St.3d at 604, 605 N.E.2d at 924-925.

{¶ 59} One of the photos alleged to be objectionable, State Exhibit 18, shows Kyle's body on the ground in his driveway next to Eberhart's car, with Kyle's hand in his pocket. This photo supports Eberhart's testimony as to the robbery, and that Kyle was searching through his pockets looking for money. State Exhibit 19, a closer view of Kyle's body, shows the wound on the right side of his head, and his head in a pool of blood. This photograph corroborates Eberhart's and the expert's testimony that Kyle was shot at point-blank range. It also supports Eberhart's and the coroner's testimony as to the cause and immediacy of death, and is probative of Dennis's purposeful intent.

{¶ 60} The last photo, State Exhibit 20, is arguably cumulative to the others, especially State Exhibit 19. This photo, a close-up of Kyle's head, clearly shows the entrance wound from the shotgun blast. While this photo displays more explicit detail in support of the state's witnesses testimony, either this photo or State Exhibit 19 perhaps should have been excluded.

{¶ 61} In view of the abundant evidence of Dennis's guilt, his substantial rights were not affected. In addition, any prejudicial impact this evidence may have had on the sentencing phase is eliminated by this court's independent review of the sentence. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 486, 653 N.E.2d 304, 318; *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710, 721. Proposition of Law No. 17 is without merit.

III

*Penalty Phase Issues*

{¶ 62} In Proposition of Law No. 4, Dennis argues the trial court erred in denying his motion to merge the convictions of aggravated robbery of Eberhart and Kyle into the allied offense conviction for aggravated murder. However, merger pursuant to R.C. 2941.25 is not warranted in this case because aggravated robbery

is not an allied offense of similar import to aggravated murder. See *State v. Moss* (1982), 69 Ohio St.2d 515, 23 O.O.3d 447, 433 N.E.2d 181, paragraph two of the syllabus; *State v. Henderson* (1988), 39 Ohio St.3d 24, 28, 528 N.E.2d 1237, 1242; *Frazier,* 73 Ohio St.3d at 342-343, 652 N.E.2d at 1016.

{¶ 63} Dennis also claims error in the court's failure to merge the attempted aggravated murder of Pizer count with the course-of-conduct specification. However, specifications required for the imposition of the death penalty do not, in and of themselves, constitute separate criminal offenses. Therefore, a specification cannot merge with a substantive offense. *State v. Adams* (1978), 53 Ohio St.2d 223, 226, 7 O.O.3d 393, 395, 374 N.E.2d 137, 139-140. "Since the specification does not charge a separate offense and R.C. 2941.25(A) relates to instances where the same conduct of the defendant constitutes allied offenses of similar import, that statute is not applicable." *Id.* at 226-227, 7 O.O.3d at 395, 374 N.E.2d at 140. Accordingly, Proposition of Law No. 4 is overruled.

{¶ 64} In Propositions of Law Nos. 10 and 13, Dennis argues that the trial court erred in allowing victim-impact testimony by Craig Kyle, brother of the decedent, and Doreen Kyle, decedent's mother.

{¶ 65} During the mitigation phase, Craig Kyle testified about the close relationship he had experienced with his brother, as well as the good relationship decedent had had with his parents. At the sentencing proceeding held after the jury was discharged but before sentence was pronounced, Doreen Kyle made a statement wherein she eulogized the accomplishments and character of her late son. However, neither statement expressed any opinion or suggestion as to what sentence should be imposed on defendant, and therefore did not constitute prejudicial error.

{¶ 66} In *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 439, 650 N.E.2d 878, 882, this court recognized *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720, and held that statements restricted to the impact the victim's

16

death has on family and friends did not constitute prejudicial error under the circumstances therein. Nor do we think the statements in issue here run afoul of the *Fautenberry* standard.

**{¶ 67}** Moreover, the statement made by Doreen Kyle was made after the jury was discharged, and thus could not have affected the jury's sentence recommendation. Even if it is assumed, as Dennis suggests, that the trial court necessarily considered the testimony of Dennis Kyle's mother in its sentencing, this court will presume that the judge considered only the relevant, material, and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record. *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759; *State v. Eubank* (1979), 60 Ohio St.2d 183, 187, 14 O.O.3d 416, 418, 398 N.E.2d 567, 570. A review of the transcript and sentencing opinion reveals no prejudice to Dennis. Therefore, we reject both Propositions of Law Nos. 10 and 13.

**{¶ 68}** In Proposition of Law No. 12, Dennis claims error in the trial court's failure to give the jury a supplemental instruction pursuant to *State v. Howard* (1989), 42 Ohio St.3d 18, 537 N.E.2d 188, when the jury indicated that it was unable to reach a unanimous verdict.

**{¶ 69}** At the close of the mitigation phase, the jury retired to deliberate sometime during the afternoon. On that same day following their dinner break, the jury sent a note to the court asking, "Judge Spicer, what do we do when we have voted four times and we are unable to come to a unanimous verdict?" In the presence of counsel for both parties, the court responded to the jury within fifteen minutes as follows: "This has been a very short time of deliberation on a very major case. You must not be discouraged and continue your deliberations. Reread the instructions. Judge Spicer."

**{¶ 70}** In *Howard*, we rejected further use of the so-called *Allen* charge that was a standard supplemental instruction given to juries which were deadlocked on

the question of conviction or acquittal. This court then adopted a new supplemental instruction to be given to deadlocked juries in the trial phase of a case. This court has not addressed the applicability of a *Howard* charge in the penalty phase of a capital case, and therefore we need not address that issue here to resolve this proposition.

{¶ 71} The trial judge's response was proper, neutral, and noncoercive under the circumstances. The jury was not deadlocked, since it had deliberated only a few hours before it posed the question in issue. Accordingly, we reject Proposition of Law No. 12.

{¶ 72} In Proposition of Law No. 14, Dennis asserts that the trial court erred by making its sentence decision prior to defendant's statement and the arguments of counsel at the sentencing proceeding. Dennis asserts that the following statement made by the court indicates its predisposition: "It's my understanding at this point that, obviously, we are here today for sentencing, and I have done my homework and made my determinations."

{¶ 73} R.C. 2929.03(D)(3) requires the court to consider, *inter alia*, relevant evidence, the statement of defendant and the arguments of counsel, before imposing sentence. However, the court's statement cited above does not necessarily indicate that the court ignored the statement of Dennis or the arguments of counsel. Dennis's assertion to the contrary is merely speculative. Even assuming that Dennis raises a legitimate point, our independent review will readily cure any perceived error in this vein. See *State v. Lott,* 51 Ohio St.3d at 170, 555 N.E.2d at 304. Therefore, we reject Proposition of Law No. 14.

{¶ 74} In Proposition of Law No. 16, Dennis contends that the prosecutor made an improper and inflammatory statement of personal opinion during closing argument:

"I urge you to give this man the same consideration he gave Kurt Kyle on the morning of June 5, 1994, and if you do that, you will find that the aggravating

circumstances outweigh the mitigating factors and you will return to this Court a recommendation that the death sentence be imposed in this case and I ask you to do that."

**{¶ 75}** Defense counsel did not object to this statement, and therefore waived all but plain error. *Slagle,* 65 Ohio St.3d at 604, 605 N.E.2d at 925. Plain error does not exist unless it can be said "that but for the error, the outcome of the trial would clearly have been otherwise." See, *e.g., State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 357, 662 N.E.2d 311, 322.

**{¶ 76}** Nevertheless, the statement complained of by Dennis does not appear to be either inflammatory or prejudicial. Even if the statement is characterized as the prosecutor's personal opinion, such a statement is permissible, since it was based on the evidence presented during the penalty phase. See *State v. Durr* (1991), 58 Ohio St.3d 86, 96, 568 N.E.2d 674, 684. Proposition of Law No. 16 is without merit.

**{¶ 77}** In Proposition of Law No. 19, Dennis reviews the mitigation evidence presented before the trial court and claims that imposition of the death sentence was inappropriate in this case. We disagree and find this proposition to be without merit. See our discussion of "Independent Review and Proportionality Analysis," *infra*.

IV

*Constitutional Issues*

**{¶ 78}** Propositions of Law Nos. 18, 20, and 21 raise arguments we have already rejected numerous times. See, *e.g., State v. Henderson* (1988), 39 Ohio St.3d at 28-29, 528 N.E.2d at 1242-1243, and paragraph two of the syllabus; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 317, 652 N.E.2d 988, 997; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 168, 15 OBR 311, 314-315, 473 N.E.2d 264, 273; *State v. Zuern* (1987), 32 Ohio St.3d 56, 63-66, 512 N.E.2d

585, 592-594; *State v. Lawrence* (1989), 44 Ohio St.3d 24, 27, 541 N.E.2d 451, 455; *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 198, 616 N.E.2d 909, 920; and *State v. Buell* (1986), 22 Ohio St.3d 124, 141, 22 OBR 203, 217-218, 489 N.E.2d 795, 810.  We summarily overrule these propositions.  *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

V

*Effective Assistance of Counsel*

{¶ 79} In Proposition of Law No. 15, Dennis asserts that he was denied the effective assistance of trial counsel during voir dire and the mitigation phase.

{¶ 80} Reversal of a conviction on the grounds of ineffective assistance requires defendant to show, first, "that counsel's performance was deficient," and second, that "the deficient performance prejudiced the defense * * * so seriously as to deprive the defendant of a fair trial."  *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693.  However, Dennis has not demonstrated prejudice — "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."  *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 81} Dennis first cites counsel's failure to object to the court's numerous statements to prospective jurors that their role in the penalty phase was merely to "recommend" a sentence to the court.  However, counsel's decision not to interrupt reflected an "objective standard of reasonable representation,"  *Bradley,* at paragraph two of the syllabus, given this court's prior pronouncements on this issue.  See, *e.g., Woodard,* 68 Ohio St.3d at 77-78, 623 N.E.2d at 81.

{¶ 82} Dennis next asserts that counsel failed to inform the jurors that intoxication could be considered for its effect on the accused's mental state and the mental element of the crime.  Dennis also contends that counsel was ineffective for failing to request an instruction on intoxication as a mitigating factor.

**{¶ 83}** However, counsel's decision to not pursue some type of intoxication defense was not unreasonable, especially since two key witnesses, Pizer and Eberhart, testified that Dennis did not appear to be intoxicated. In addition, while intoxication may reduce one's inhibitions, even severe intoxication can co-exist with purpose to kill. *State v. Hicks* (1989), 43 Ohio St.3d 72, 74, 583 N.E.2d 1030, 1034. Likewise, counsel did not fall below an objective standard of reasonable representation by failing to request an instruction on intoxication as a mitigating factor. "[V]oluntary drunkenness and drug use are not mitigating factors." *Slagle,* 65 Ohio St.3d at 614, 605 N.E.2d at 931. At best, voluntary intoxication is a "weak" mitigating factor entitled to little or no weight. *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 145, 652 N.E.2d 710, 714. Moreover, this court has held that trial courts are not required to instruct the jury on individual, nonstatutory mitigating factors which can be considered by the jury under the R.C. 2929.04(B)(7) "catch-all" factor. *Landrum,* 53 Ohio St.3d at 122, 559 N.E.2d at 710.

**{¶ 84}** Dennis also criticizes counsel's failure to ask prospective jurors questions about attitudes on race; questions about whether they could consider the mitigation evidence that would be presented; or questions "tailored to fit the circumstances" of this case. However, "[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042, 1056. Dennis does not demonstrate prejudice that affected the outcome of his trial under *Strickland* and *Bradley*.

**{¶ 85}** Dennis also cites counsel's failure to "rehabilitate" favorable prospective jurors, to timely object to the excusal of two prospective jurors for their views on the death penalty, or to object to the peremptory challenges of the prosecution.

**{¶ 86}** We rejected a similar "failure to rehabilitate" argument in *Bradley,* 42 Ohio St.3d at 143, 538 N.E.2d at 381. Counsel is in a much better position to

determine if jurors could be "rehabilitated" than this court, and a decision not to "rehabilitate" particular jurors is within the scope of acceptable practice envisioned in *Strickland*. Counsel's failure to object to the excusal of the two prospective jurors for their death penalty views and failure to object to the prosecution's peremptory challenges did not constitute error. (See discussion under Propositions of Law Nos. 7, 8, and 9.) Since none of these claims amounts to reversible error, counsel was not ineffective for failing to object.

{¶ 87} Last, Dennis submits that counsel was ineffective for failing to request a supplemental jury instruction pursuant to *State v. Howard,* and for failing to request a mistrial when the court allowed juror Harris to remain on the jury. Yet, as discussed under Proposition of Law No. 12, a *Howard* instruction was not warranted at the time the jury sent its note to the trial judge indicating it could not reach a unanimous verdict.

{¶ 88} Nor did counsel's failure to make a timely motion for a mistrial constitute ineffective assistance, since Dennis does not show how he was prejudiced by the court's failure to remove juror Harris. Moreover, the court did entertain defense counsel's motion for a mistrial on that ground after the jury was excused. The court overruled the motion for mistrial, and we find no abuse of discretion in this decision. See *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 382, 510 N.E.2d 343, 349-350. Proposition of Law No. 15 is without merit.

VI

*Independent Review and Proportionality Analysis*

{¶ 89} After independent assessment, we find that the evidence supports beyond a reasonable doubt the aggravating circumstance that Dennis murdered Kurt Kyle while committing aggravated robbery and that Dennis was the principal offender. R.C. 2929.04(A)(7). In addition, the evidence supports beyond a reasonable doubt the aggravating circumstance that Dennis attempted to kill Pizer

before murdering Kyle as part of a course of conduct involving the purposeful killing or attempt to kill two or more persons. R.C. 2929.04(A)(5).

{¶ 90} Nothing in the nature and circumstances of the offense appears mitigating. Dennis and Lavar Anderson decided to go out on a robbery spree armed with guns. Perhaps to help them summon up the courage to do so, the pair smoked marijuana and drank at a bar before encountering their first victim, Dean Pizer. Dennis told Pizer, "you are going to die tonight, * * *," and tried to kill Pizer when he fled. Minutes later, Dennis and Anderson held up Kyle and Eberhart in Kyle's driveway. Eberhart handed money over to Anderson, but Kyle told Dennis he didn't have any money on him. Before Kyle could even get his hand out of his pocket, Dennis raised his shotgun and fired, at point-blank range, a blast at Kyle's head, killing him instantly. Dennis and Anderson fled the scene and were not apprehended until several days later, when the police acted on an anonymous tip.

{¶ 91} Dennis's claim that he was so intoxicated he could barely stand or walk that evening lacks credibility in view of all the evidence and testimony adduced and proffered at trial.

{¶ 92} Dennis's history, character, and background indicate some mitigating features. Dennis's mother was nineteen when he was born, and his parents experienced marital difficulties from the time Dennis was three weeks old. The problems with the marriage culminated in the parents' separating when Dennis was five to six years old. In school, Dennis had a history of limited academic success, and his numerous absences and academic difficulties caused him to repeat both kindergarten and first grade. In later grades, Dennis continued to miss many days of school and failed most subjects.

{¶ 93} When Dennis became a teenager, his home situation grew worse. Dennis's mother became a person who was "just not caring" about anything with her two children. All of the utilities at home were shut off. As a result, the county

children services board ("CSB") took the Dennis children from the mother, and Dennis was eventually placed in a foster home.

{¶ 94} Dennis suffered a coma as the result of a swimming accident during the summer of 1992 and almost drowned. As Dennis approached adulthood, he completed an independent living program operated by the CSB. Dennis later asked the CSB about the Job Corps, and in February 1994, he went to Edinburg, Indiana, to obtain job training and earn his G.E.D., which he did. Dennis returned to his foster home in Akron in April 1994, and the CSB requested termination of his long-term foster care, since he had reached the age of majority.

{¶ 95} During the mitigation hearing, Dennis gave unsworn testimony describing the events leading up to and including the robberies and murder. Dennis expressed remorse and sorrow for Kyle's family and claimed he never meant to kill Kyle.

{¶ 96} Dr. James L. Brown, a clinical and forensic psychologist, also testified on Dennis's behalf. Dr. Brown reviewed Dennis's school and medical records and interviewed Dennis, his aunt and foster mother. In addition, Dr. Brown reviewed Dennis's psychosocial history and gave him the Minnesota Multiphasic Personality Inventory. Dr. Brown opined that Dennis had difficulties with social and interpersonal relationships and that he tended towards antisocial activities. Dennis has exceedingly poor judgment and great difficulty learning from experience. Typically, Dennis would view emotional feelings as a weakness and would therefore tend to put on a strong, uncaring facade.

{¶ 97} In Dr. Brown's opinion, three factors should mitigate against imposing death on Dennis: (1) He lacked any effective "parenting" until around age fifteen; (2) he was intoxicated at the time of the offense, due to drinking alcohol and smoking marijuana dipped in embalming fluid to intensify its effect; and (3) he was only eighteen at the time of the offense. Dr. Brown stated that Dennis has an I.Q. of 86, which would put him in the low average range of intelligence. However,

Dr. Brown conceded that Dennis knew right from wrong. Dr. Brown did not testify that Dennis's developmental problems gave rise to any mental disease or defect.

{¶ 98} With regard to the statutory mitigating factors, R.C. 2929.04(B)(4) is entitled to appropriate appreciable weight in mitigation, since Dennis was eighteen years old at the time of the offense.

{¶ 99} R.C. 2929.04(B)(5) is also relevant since his only prior convictions were two juvenile adjudications for criminal damaging and receiving stolen property. While Dennis admitted using marijuana, he had never been charged with a drug offense.

{¶ 100} Under R.C. 2929.04(B)(7), several facts testified to by Dr. Brown are mitigating, such as the lack of any effective guidance for Dennis during most of his life, resulting in antisocial psychological tendencies. In addition, Dennis's apparent remorse over his criminal behavior should be given modest weight in mitigation. However, we assign no mitigating weight to Dennis's voluntary drunkenness and marijuana intoxication. See *Slagle,* 65 Ohio St.3d at 614, 605 N.E.2d at 931. Voluntary intoxication can constitute a "weak" mitigating factor, but only in certain circumstances. *D'Ambrosio,* 73 Ohio St.3d at 145, 652 N.E.2d at 714.

{¶ 101} Upon independent weighing, we conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Dennis and his accomplice armed themselves and set out to rob people on the night of June 4, 1994. Dennis's drinking and marijuana smoking before the crimes are indicative of someone trying to raise up the courage to follow through with his intentions. Dennis fired his sawed-off shotgun at Pizer when Pizer fled. Dennis reloaded his sawed-off shotgun, showing that he was not content to use it merely as a prop to rob money from his next victim. While Dennis and Anderson robbed Kyle and Eberhart, Dennis fired his weapon again when Kyle produced no money, even though Anderson successfully robbed Eberhart at the same time. Dennis's course

of action that night was clear: if he did not obtain money from his robbery victims, he would fire a shotgun blast their way. We hold that in spite of the mitigating factors present in this case, Dennis's actions in these crimes merit the capital penalty to which he was sentenced.

{¶ 102} We further find that the death penalty imposed in this case is both appropriate and proportionate when compared with similar cases of murder as a course of conduct involving the purposeful killing or attempt to kill two or more persons. See, *e.g., State v. Loza* (1994), 71 Ohio St.3d 61, 641 N.E.2d 1082; *Lundgren,* 73 Ohio St.3d 474, 653 N.E.2d 304. The penalty is also appropriate and proportionate when compared with capital cases combining aggravated murder with aggravated robbery. See, *e.g., State v. Green* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253; *Lott,* 51 Ohio St.3d 160, 555 N.E.2d 293.

{¶ 103} For all the foregoing reasons, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

———————————